IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:03CV406 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN R. KOCH, | ) | MEMORANDUM AND ORDER ON |
| | ) | DEFENDANT'S MOTION IN LIMINE |
| Defendant. | ) | AND REQUEST FOR <u>DAUBERT</u> |
| | ) | HEARING |

The plaintiff filed this action against the defendant, John R. Koch, to enforce provisions of the Fair Housing Act, 82 Stat. 81, as amended, 42 U.S.C. §§ 3601 <u>et seq</u>.  (<u>See</u> Compl., filing 1, ¶ 1.)  The complaint alleges that the defendant discriminated "against persons on the basis of sex in connection with the rental of dwellings."  (<u>Id.</u> ¶ 5.)  The parties have referred to these persons as "the aggrieved persons," and I shall adopt that convention in this memorandum.  Now before me is the defendant's motion in limine and request for <u>Daubert</u> hearing, filing 37, which seeks to prevent the plaintiff's expert, Dr. Louise Fitzgerald, from testifying at trial.  For the following reasons, I find that the defendant's motion must be granted in part.

## I.    STANDARD OF REVIEW

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  <u>See</u> <u>Lauzon v. Senco Products, Inc.</u>, 270 F.3d 681, 686 (8th Cir. 2001).  The admissibility of testimony by experts is governed by Federal Rule of Evidence 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

1

Fed. R. Evid. 702.  The Advisory Committee Note accompanying Rule 702 indicates that in the year 2000, Rule 702 was amended in response to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny.  In Daubert, the Supreme Court "held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589).  The amendment to Rule 702 affirms the Supreme Court's casting of the trial court in the role of a "gatekeeper," Fed. R. Evid. 702 advisory committee note, who must "ensure the reliability and relevancy of expert testimony" and "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Carmichael, 526 U.S. at 152.  The Court has listed certain factors that may be used by the trial court in connection with its reliability determination:

–Whether a "theory or technique . . . can be (and has been) tested";
–Whether it "has been subjected to peer review and publication";
–Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
–Whether the theory or technique enjoys "'general acceptance'" within a "'relevant scientific community.'"

Carmichael, 526 U.S. at 149-50 (quoting Daubert, 509 U.S. at 592-94).  The trial court should consider these factors "where they are reasonable measures of the reliability of expert testimony," but, at the same time, the trial court is granted "considerable leeway" to determine "how to test an expert's reliability."  Id. at 152.

## II.   ANALYSIS

Acting in my role as gatekeeper, I have reviewed Dr. Fitzgerald's entire report to ensure that her proposed testimony is reliable and relevant.  The report is divided into three parts: "I. Introduction and Overview"; "II.  Summary of Allegations"; and "III.  Summary of Scientific Knowledge Concerning Sexual Harassment as it Applies to Housing."  (Fitzgerald Report (hereinafter "Report" at 2.)  There are also five appendices attached to the report.  (See id.)  Dr. Fitzgerald's expert opinions appear in Part III of her report; therefore, my analysis focuses upon

-2-

this portion of the document.[1]

Part III of Fitzgerald's report is divided into several sections, and I shall analyze each in turn.[2]

**A.   "The Nature and Frequency of Sexual Harassing Behavior in the United States"**

The first section of the relevant portion of Dr. Fitzgerald's report is entitled, "The Nature and Frequency of Sexual Harassing Behavior in the United States." (Report at 9.) Here Dr. Fitzgerald states that there is "confusion . . . concerning exactly what is meant by [the term "sexual harassment"], as well as the distinction between statutory and legal guidelines, on the one hand, versus actual behavior on the other." (Id.) She then defines "three general categories of offensive sex-related behaviors" that have been identified in social science research: "gender harassment (gender hostility), unwanted sexual attention, and sexual coercion." (Id.) Finally, she opines that the defendant's behavior amounts to "unwanted sexual attention and coercive behavior," and she analogizes these three categories of behaviors to the "legal category of quid pro quo" and "hostile environment." (Id.)

I do not question the reliability of Dr. Fitzgerald's categories of "offensive sex-related behaviors"; however, it seems to me that their relevance is slim, and there is great potential for confusion of the trier of fact. See Fed. R. Evid. 403. Indeed, when reading Dr. Fitzgerald's report, I find it difficult to bear in mind the different meanings associated with the term "sexual harassment." Furthermore, Dr. Fitzgerald's attempt to analogize "the behavior described by the

---

[1]Part I of the report contains a description of Dr. Fitzgerald's professional background, the purpose and structure of her report, and the materials she reviewed to prepare her report. (See Report at 4-5.) Part II summarizes the plaintiff's allegations against the defendant and the defendant's response. (See id. at 7.) Appendix A presents Dr. Fitzgerald's "curriculum vitae"; Appendix B lists the references that Dr. Fitzgerald cites in her report; Appendix C lists the "[f]ederal cases in which Dr. Louise Fitzgerald has testified as an expert at trial or by deposition within the preceding four years"; Appendix D lists the case materials that Dr. Fitzgerald reviewed prior to writing her report; and Appendix E sets forth Dr. Fitzgerald's fees for her expert services. (See id. at 28-52.)

[2]It is not practical for me to analyze each sentence of the report and determine whether it contains an admissible opinion. Rather, I shall consider what I perceive to be the thrust of each section of Part III of the report, and determine whether the section, as a whole, is based upon opinions that are admissible in this case.

aggrieved persons in the present case" to the "legal categories" of sexual harassment is improper. The jury will receive instructions from me regarding the characteristics of sexual harassment, see Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003) ("Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them."), and it is the jury's task to determine whether discrimination has occurred.  Dr. Fitzgerald may not testify that the alleged conduct of the defendant amounts to, or approximates, unlawful sex discrimination.

In sum, I conclude that Dr. Fitzgerald will not be permitted to testify to the opinions stated in the section of her report entitled, "The Nature and Frequency of Sexual Harassing Behavior in the United States."

**B.   "Nature and Extent of Sexual Harassment in Housing"**

The next section of the report is entitled, "Nature and Extent of Sexual Harassment in Housing."  (Report at 10.)  In this section, Dr. Fitzgerald first describes the prevalence of "sexual harassment"[3] of women "at the hands of their landlords, building managers, property owners, and real estate agents."  (Id.)  This evidence will not help the jury to understand the evidence or determine a fact in issue–it is simply not relevant to the question of whether the defendant actually sexually harassed the aggrieved persons.  It will be excluded.

Dr. Fitzgerald proceeds to describe the "nature" of sexual harassment in the home.  (See Report at 10-11.)  More specifically, she describes this harassment as "more threatening than similar experiences in the workplace," and "more frightening," chiefly because harassment at home involves a "home invasion" aspect that is rarely seen in "workplace harassment."  (Id. at 10.)[4]  It seems to me that in this case there is no need to compare the levels of fear and threat

---

[3]I assume that Dr. Fitzgerald uses the term "sexual harassment" in its "behavioral," as opposed to its "legal," sense, here and throughout her report.  (See Report at 9 n.2.)  This assumption is supported by the fact that Dr. Fitzgerald refers to "incidents of sexual harassment . . . which were never reported."  (Report at 10.)  I believe it is safe to assume that if an instance of "sexual harassment" (in the behavioral sense) was not reported, there was no determination that sexual harassment (in the "legal" sense) occurred.

[4]Dr. Fitzgerald also opines that harassment at home is more frightening and threatening because the perpetrator has "access to and power over the tenants' children, significant others,

caused by harassment in the home with the levels that arise in the workplace.  Therefore, Dr. Fitzgerald's opinion on this point is irrelevant and will be excluded.  Furthermore, I find that the jury is capable of determining, without the assistance of an expert opinion, that home invasion, if it occurred, is "threatening" or "frightening."  Testimony on this point would not be helpful, and it shall not be admitted.

Finally, I note that Dr. Fitzgerald opines that "the majority of victims [of sexual coercion] have few financial resources and are often on public assistance."  (Report at 10.)  The source of this opinion is unclear; there may be no source, or the source may be an unpublished article authorized by "Reed and her colleagues."  (Id.)  In either event, I find that there has not been a sufficient showing that Dr. Fitzgerald's opinion is the product of reliable principles and methods.  For that reason, the opinion must be excluded.

I see no opinion in this section of the report that meets the criteria for admissibility.  I therefore conclude that the opinions presented in the section of the report entitled, "Nature and Extent of Sexual Harassment in Housing," will not be admitted into evidence at trial.

### C.    "Prevalence of Various Types of Harassment in Housing"

The next section of the report is entitled, "Prevalence of Various Types of Harassment in Housing."  (See Report at 11.)  I have already determined that opinions concerning the prevalence of harassment in the home are to be excluded.  (See supra Part II.B.)

In addition to "prevalence" information, this section of the report also contains a lengthy comparison of the different patterns of harassment in "the housing and employment contexts." (Report at 11.)  I fail to see how this evidence is relevant to this case, and it would be of no assistance to the trier of fact.  These opinions will not be admitted at trial.

At the end of this section, Dr. Fitzgerald opines that "[t]he pattern of behavior alleged in the present case is consistent with what is known from research concerning the nature and relative frequency of harassing behavior in housing."  (Report at 14.)  It seems to me that this opinion carries with it a great risk of confusion for the jury, because it will require the jurors to distinguish Dr. Fitzgerald's behavior-based definitions of "harassing behavior" from the legal

_____

and private lives."  (Report at 10.)

instructions that will be provided at trial.  As I noted previously, Dr. Fitzgerald declares that there is much confusion on this point, (see Report at 9 & n.2), and she admits that social scientists use the term "sexual harassment" to refer to something other than "illegal sex discrimination," (see id. at 9 n.2).  In short, I am concerned that Dr. Fitzgerald's opinion would lead the jury to infer that the incidents described by the aggrieved persons did occur, and that they amount to sexual discrimination in the "legal" sense.  Furthermore, if Dr. Fitzgerald's opinion were properly understood, it would be not only confusing, but irrelevant–the jury need not determine whether the alleged incidents are consistent with social scientists' understanding of harassing behavior in housing.

In sum, none of the opinions set forth in the section entitled, "Prevalence of Various Types of Harassment in Housing," is admissible.

### D.   "Causes of Sexual Harassment"

The next section of the report is entitled, "Causes of Sexual Harassment."  (See Report at 14.)  In this section, Dr. Fitzgerald suggests that although "it is not possible to identify any particular group or 'type' of individual as the 'typical' harasser," "some men are more likely to harass than others."  (Id. at 15.)  She states that men with certain characteristics, specifically, "hostility towards women, adversarial sexual beliefs, and commitment to the traditional role arrangement between the sexes," may be sexually aroused by being in a position of power over a woman, and that "[g]iven the necessary opportunity, such men are likely to act out their attraction."  (Id.)  She also implies that the defendant would have had such an opportunity by virtue of being a landlord.  (See id.)

It seems to me that testimony designed to impart to the jury an understanding of the characteristics of likely "harassers" carries with it a potential for prejudice that far exceeds its probative value.  Such testimony will not help the jury determine whether the defendant violated the Fair Housing Act, and it seems to me that the jury's determination of this issue ought to be based upon the facts presented at trial, not upon an expert's opinion that the defendant matches the profile of a person who may be likely to harass.

Furthermore, I note that there is no indication that the defendant has "hostility towards women, adversarial sexual beliefs, [or] commitment to the traditional role arrangement between

-6-

the sexes," such that he falls within the class men who are likely to be aroused by being in a position of power over women. In other words, there is no evidence that the defendant fits the profile of a person "likely to act out [his] attraction." (Report at 15.) Without such evidence, Dr. Fitzgerald's testimony does not "fit" the facts of this case. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993); see also Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir 2000) ("[T]he expert testimony must not only be based on reliable science but must also 'fit' the particular facts of the case.").

Also in this section of the report, Dr. Fitzgerald opines that "appropriate environmental conditions and norms can exert a powerful 'brake' on inappropriate and harassing actions, even by men who are otherwise predisposed to do so." (Report at 15.) She adds, however, that "few if any" of these conditions and norms are present in "housing environments." (Id.) These opinions are not admissible, because knowing that there are few "braking" conditions in the "housing environment" will not assist the jury in determining whether harassment occurred in this case.

None of the opinions set forth in the section entitled, "Causes of Sexual Harassment," will be admitted at trial.

## E.    "Emotional and Psychological Consequences of Sexual Harassment"

The next section of the report is entitled, "Emotional and Psychological Consequences of Sexual Harassment." (Report at 15.) In this section, Dr. Fitzgerald explains that "intrusive and unwanted sex-related behavior has serious consequences, from embarrassment, anxiety, and lowered self-esteem to full-fledged psychological disorders such as Major Depressive Disorder and Post-Traumatic Stress Disorder." (Id. (citation omitted).) She adds that "sexually harassing experiences can cause substantial emotional damage, even when such experiences are less serious and intense than typically required to trigger statutory relief." (Id. at 16.)

The pretrial order indicates that the plaintiff seeks damages to remedy the "[e]motional distress and other intangible damages caused by the defendant's harassment." (See filing 44.) Thus, testimony regarding the emotional and psychological consequences of harassment is relevant. Indeed, the Eighth Circuit has noted that expert proof regarding the causation of a claimant's emotional distress is probative. See Bailey v. Runyon, 220 F.3d 879, 881 (8th Cir.

-7-

2000) (citing, inter alia, Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1298 (8th Cir. 1997)).

However, I am not convinced that the particular opinions offered by Dr. Fitzgerald will be

helpful to the jury's determination of this issue in this case.

First, it is clear that Dr. Fitzgerald cannot be allowed to opine that "sexually harassing

experiences can cause substantial emotional damage" even if there has been no violation of the

Fair Housing Act.  This opinion is not relevant, because in this case the defendant will not be

liable to the aggrieved persons absent a violation of the Act.

Second, I note that unlike the expert testimony at issue in Bailey and Jenson, Dr.

Fitzgerald's opinions are not based upon examinations of the aggrieved persons (or any medical

records pertaining to them); rather, she opines that sexual harassment generally causes emotional

distress.  Dr. Fitzgerald does elaborate upon this general opinion by describing specific

psychological injuries that can occur, but since she cannot offer any insight into the actual

injuries suffered by any aggrieved person,[5] her opinions will not be helpful to the trier of fact.

Dr. Fitzgerald's summation of the opinions presented in this section of her report

illustrates their shortcomings:

> In sum, a large body of scientific data reliably demonstrates that
> experiencing sexual harassment, even at low levels of frequency and intensity, can
> lead to decrements in psychological well-being and elevations in psychological
> distress, up to and including major emotional disorders.  Although not every
> individual who is exposed to such experiences will develop symptoms of
> emotional distress, such reactions are more common than not – indeed, they
> appear to be the normative response.

(Report at 18 (emphasis added).)  In short, Dr. Fitzgerald opines that emotional distress is a likely

result of "sexual harassment," as she understands the term.  This opinion will not assist the jury

to understand the evidence, because I believe it is within their competence to determine whether

the incidents alleged by the aggrieved persons occurred, and, if so, whether the incidents caused

emotional harm.  Also, this opinion will not assist the jury to determine which, if any, of the

---

[5]The plaintiff's own trial brief argues, "Damages are measured based on the injuries
actually suffered by the victim, not on the injuries that would have been suffered by a reasonable
or ordinary person."  (Pl.'s Trial Br., filing 65, at 17 n.7 (citing Curtis v. Loether, 415 U.S. 189,
195 (1974); Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1294-95 (8th Cir. 1997)) (emphasis
in original).)

aggrieved persons experienced emotional harm in this case.  Therefore, I conclude that the opinions set forth in the section of the report titled, "Emotional and Psychological Consequences of Sexual Harassment," are not admissible at trial.

###### F.   "Factors and Conditions that Lead to Psychological Harm"

The next section of the report is entitled, "Factors and Conditions that Lead to Psychological Harm."  (Report at 18.)  In this section, Dr. Fitzgerald discusses a detailed model that outlines three sets of factors that influence the severity of the psychological harm caused by harassment.  These factors are "Stimulus factors," which are the "objectively defined aspects of the harassing behavior itself," such as whether the harassment was verbal or physical; "Contextual factors," which refer to the context in which the harassment takes place; and "Individual factors," which refer to the vulnerability of the harassed person.  (Report at 18-21.) Dr. Fitzgerald proceeds to opine that seven of the eight severe stimulus factors are present in this case; that the context of the harassment suggests that it would have severe effects; and that the aggrieved persons are a "vulnerable group."  (See id. at 18-21.)

The opinions set forth in this section of the report are nicely summarized by Dr. Fitzgerald in the "Summary and Conclusions" section of her report, which states at paragraph 3,

> Analysis of the risk for harm that characterizes the present case demonstrates the presence of a high level of severity, including seven of the eight severity factors identified in the social science literature.  Similarly, as in virtually all housing situations, environmental constraints on perpetrator behavior were notable by their absence.  Although there is insufficient material to conduct an analysis of individual vulnerability factors, the complainants as a group are characterized by few resources and high levels of vulnerability.  This combination of factors (i.e., severity of harassing behavior, a tolerant environmental context, and a group of low resource, highly vulnerable victims) can be expected to produce a high level of emotional distress.

(Report at 27.)  In short, Dr. Fitzgerald opines that given the stimulus, contextual, and individual factors described by the aggrieved persons as a group, she expects that the aggrieved persons as a group probably experienced a high level of emotional distress.  However, the jury will not be asked to determine whether aggrieved persons experienced collectively a high level of emotional distress.  I find that the opinions offered by Dr. Fitzgerald in this section of her report have a greater potential for misleading or confusing the jury than they have probative value.  Therefore,

they shall not be admitted.

### G.    "Individual Responses to Sexual Harassment"

The next section of the report is entitled, "Individual Responses to Sexual Harassment." (Report at 21.)  In this section, Dr. Fitzgerald explains that most victims of sexual harassment[6] "do not report it and . . . simply endure the situation and hope that it will somehow 'go away.'" (Id.)  She states that research shows a "notable discrepancy" between "how people believe that they would respond to harassment if they were exposed to it and . . . how targets actually do respond to it."  (Id.)  She also states that victims' responses to harassment are either "internally focused," which are "characterized by attempts to manage the thoughts and emotions associated with the experience," and "externally focused," which are "more problem solving in nature."  (Id. at 22.)

It seems to me that these opinions are the sort of "social framework" testimony, (Report at 5), that would assist the jury to understand evidence concerning the aggrieved persons' reactions to the alleged harassment by the defendant.  In particular, it may serve to illustrate to the jury that commonly-held conceptions about victim's responses to harassment are incorrect.  Also, it is clear that Dr. Fitzgerald has not "crossed over the line" and offered "an opinion about the truthfulness of witness testimony."  Nichols v. American National Insurance Co., 154 F.3d 875, 883 (8th Cir. 1998)  The opinions set forth in this section are admissible.

### H.    "Differential Prevalence of Response Strategies"

The next section of the report is entitled, "Differential Prevalence of Response Strategies."  (Report at 22.)  Here Dr. Fitzgerald elaborates upon the "internally focused" and "externally focused" responses to sexual harassment described in the previous section.  (See supra Part II.G.)  The opinions set forth in this section will be admitted for the same reasons that favored the admission of the opinions in the previous section, with one important caveat.

In this section of the report, Dr. Fitzgerald repeatedly applies her knowledge of victims' responses to harassment to the specific facts of this case.  For example, after describing an aggrieved person's testimony that she complied with the defendant's alleged requests for "sexual

---

[6]Again, I assume that the term "sexual harassment" is being used in a "non-legal" sense.

cooperation," she states, "Such acquiescence cannot be taken, in and of itself, as indication of welcomeness, consent, or the like . . . ." (Report at 22 (emphasis omitted).) This is improper. Dr. Fitzgerald may testify generally about how victims respond to harassment, but she may not opine or imply that any particular aggrieved person in this case did not consent to the defendant's actions or found the defendant's actions to be unwelcome. In short, she may not weigh the evidence for the jury. Otherwise, there is a real risk that the jury will substitute the expert's opinion for its own assessment of the evidence. Cf. Nichols v. American National Insurance Co., 154 F.3d 875, 883-84 (8th Cir. 1998) ("Dr. Pribor did more than explain psychiatric terms and the situations in which they may arise. She provided her own opinion that Nichols' statements to Dr. Tyndall were influenced by recall bias, secondary gain, and malingering. . . . These were inferences for the jury to draw from the admissible evidence before it, and Dr. Pribor's testimony impermissibly instructed the jury on how to weigh that evidence."). In short, Dr. Fitzgerald may testify about the general opinions set forth in this section of the report, but she may not illustrate them with examples taken from the testimony of aggrieved persons.

### I.   "Generalizability of Workplace Research to Housing Contexts"

The final section of Part III of Dr. Fitzgerald's report is entitled, "Generalizability of Workplace Research to Housing Contexts." (Report at 25.) In this section, Dr. Fitzgerald argues that the findings of studies concerning workplace harassment can be generalized across many different contexts. The report states, "Such generalization, what social scientists label external validity, is the goal of all research . . . . Generalizability is thus the sine qua non of scientific activity." (Report at 25.)

Dr. Fitzgerald's opinion that the findings from workplace harassment research are "generalizable" is the product of reliable scientific principles and methods. However, the report does not demonstrate well that the "workplace" findings may be generalized specifically to the "housing" context. At one point, the report suggests that "formal studies" of sexual harassment in housing "have not yet been done." (Report at 17.) Later, however, it states, "Although only two scientific investigations of sexual harassment among low-incomed housed and homeless women has [sic] so far appeared, (Ingram, Corning & Schmidt, 1996; Reed, et al., 2001), their findings are consistent with what has previously been learned about the effects of sexual

-11-

harassment in other environments." (Report at 25.) It seems to me that there may be a contradiction in these claims. More importantly, I note that the "Ingram" investigation does not appear on Dr. Fitzgerald's reference list, and the "Reed" investigation is described as "under review," which I take to mean "yet unpublished." (See id. at App. B.)[7] Thus, I cannot determine whether Dr. Fitzgerald's opinion that "workplace" findings generalize to the "housing" context is based upon peer-reviewed studies that used reliable principles and methods to reach their conclusions.

Despite these shortcomings, Dr. Fitzgerald will be allowed to present her opinion that the sexual harassment research involving workplace settings may be broadly generalized, and she may specifically state her opinion that these findings generalize to the housing context. Of course, the defendant may cross-examine Dr. Fitzgerald to attempt to probe the weakness of the foundation for her opinion.

**IT IS ORDERED** that:

1.      Several of Dr. Fitzgerald's opinions will be excluded from evidence at trial, as explained in the memorandum accompanying this order; and

---

[7]Similarly, Dr. Fitzgerald supports her argument that the effects of harassment are similar in both the workplace and housing contexts by citing "Cahan, 1987," which is an article published in the Wisconsin Law Review; "Butler, 1989," which does not appear on Dr. Fitzgerald's list of references; and "Novac (1994)," which also does not appear on the list of references, although I do find the following partial entry: "Novak, S. (1994). Boundary disputes (need rest of cite)." (See Report at 17-18; see also id. at App. B.) Dr. Fitzgerald's failure to include sources on her reference list is troubling, as is her reliance upon a law review article for its discussion of "[q]ualitative reports" from "women who have experienced harassment in housing." (Id. at 17.) While I do not mean to disparage the law review, I cannot assume that the article's analysis of "qualitative reports" was subject to the same type of peer review that it would have received in a "scientific" journal.

2.      The defendant's motion in limine and request for <u>Daubert</u> hearing, filing 37, is
        otherwise denied.

Dated November 12, 2004.

                        BY THE COURT


                        s/ Warren K. Urbom
                        United States Senior District Judge

-13-